
FILED
2009 Feb-11  AM 02:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

BALCH & BINGHAM LLP,    )
    )
    Plaintiff,    )
    )
v.    )    Civ. No.:  CV-08-HGD-2281-S
    )
U.S. COMMODITY FUTURES    )
TRADING COMMISSION,    )
    )
    Defendant.    )

**DEFENDANT COMMODITY FUTURES TRADING COMMISSION'S
MOTION TO DISMISS FOR FAILURE TO EXHAUST
ADMINISTRATIVE REMEDIES**

Exhibit 5   Plaintiff's Administrative Appeal, dated 8 Jan 2009.



**BALCH & BINGHAM LLP**

Alabama • Georgia • Mississippi • Washington, DC

A. Kelly Brennan
(205) 226-3475

Attorneys and Counselors
1901 Sixth Avenue North, Suite 1500
P.O. Box 306 (35201-0306)
Birmingham, Alabama 35203-4642
(205) 251-8100
(205) 226-8799 Fax
www.balch.com

(205) 488-5828 (direct fax)
kbrennan@balch.com

January 8, 2009

**VIA ELECTRONIC DELIVERY**
**AND FEDEX**

Freedom of Information Act Appeal
Office of the General Counsel
Commodity Futures Trading Commission
Three Lafayette Centre, 8th Floor
1155 21st Street, N.W.
Washington, D.C. 20581

Re:   **FREEDOM OF INFORMATION ACT APPEAL - FOIA No. 08-0141**

To the Office of the General Counsel:

        This letter serves as an appeal of the adverse determination issued by the Commodity Futures Trading Commission (the "Commission") by letter dated December 10, 2008,[1] with regard to the above-referenced Freedom of Information Act ("FOIA") request, which was submitted on September 15, 2008.  This appeal is submitted within 30 days of the date of the Commission's determination.

        This response is made in an abundance of caution and without waiver of Balch & Bingham LLP's right to proceed with the lawsuit against the Commission that was filed on December 9, 2009, prior to the Commission's adverse determination letter, in the United States District Court for the Northern District of Alabama, CV-08-HGD-2281-S.   Because the Commission failed to respond in the time required by law, the Commission lost any ability to demand that Balch & Bingham LLP ("Balch") proceed through the administrative process or exhaust any administrative remedies.

**I.    BACKGROUND**

        **A.    The Commission is due to proceed with the court action pending against it in**
               **Alabama.**

        By way of background, on September 15, 2008, Balch submitted a FOIA request to the Commission related to all documents relied upon by the Commission regarding various statement(s) made in the Order Instituting Proceedings Making Findings and Imposing Remedial

---

[1] A copy of the adverse determination letter is attached as Exhibit 1.

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 2

Sanctions in the Commission's Docket No.: 03-09 and 03-03 (re: Dynegy & El Paso). This request was assigned the following FOIA number: FOIA No. 08-0141 (the "FOIA Request").

By letter dated November 6, 2008, the Commission provided a "partial response" to Balch's September 15, 2008 FOIA request (FOIA No. 08-0141). A true and correct copy of this "partial response" from Commission is attached hereto as Exhibit 2.

The Commission's "partial response" states that the Commission identified "[n]ine hundred and ninety-seven pages" of material responsive to Balch's request that it has determined are exempt from disclosure and also certain unspecified "additional material that is subject to petition for confidential treatment" that the Commission "is currently reviewing." The Commission did not provide a date certain by which its review would be complete, and only after the filing of a lawsuit did the Commission provide Balch with a complete response to its request.

The Commission denied Balch the opportunity to file an administrative appeal of the agency's adverse determination until after a lawsuit had been filed. Specifically, the Commission's "partial response" stated that "[o]nce the confidential treatment process is resolved, you may, if you wish, file an appeal for access to information denied you by this letter. Please do not file your appeal until you receive a final response to your request."

More than twenty (20) working days had elapsed since Balch's September 15, 2008 FOIA request to the Commission and the filing of Balch's lawsuit against the Commission. Only after the lawsuit was filed, the Commission notified Balch of its final response and the reasons therefore. The Commission wrongfully withheld agency records responsive to Balch's September 15, 2008 FOIA request. The Commission failed to comply with the applicable time limits required under FOIA, 5 U.S.C. § 552(a)(6). At the time of the filing of the lawsuit, Balch had constructively exhausted all available administrative remedies under FOIA, 5 U.S.C. § 552(a)(6)(C). The Commission's final determination letter sent after the lawsuit was filed cannot oust the jurisdiction of the United States District Court. Because the Commission failed to timely respond, and because the Commission failed to respond until after a lawsuit was filed, the Commission is due to proceed in court.

### B. The Commission's stated bases for withholding records are without merit.

After the filing of the lawsuit, the Commission officially responded to the FOIA requests by letter dated December 10, 2008 (the "FOIA Response Letter"). In that letter, the Commission apparently contends that every shred of paper submitted by El Paso and Dynegy – specifically, "6 CD's and approximately 4,057 pages of documents" – is being withheld pursuant to exemptions (b)(3), (b)(4), and (b)(7)(A)(B)(E). *See* FOIA Response Letter at p. 1. The Commission's wholesale refusal to make documents available is improper and without merit.

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 3

Apparently, the Commission's basis for applying the exemptions cited above is twofold. First, the Commission takes the position that disclosing responsive documents will somehow deprive El Paso and Dynegy of a right to a fair trial, impede a pending investigation or action or otherwise interfere with the investigative process. However, as reflected in the Commission's Orders, the Commission has reached a full and final settlement with Dynegy and El Paso over the claims and facts at issue, and the Commission has not identified any other actions or investigations upon which it can base its reliance on the exemptions it cites.

Second, the Commission appears to take the position that by disclosing documents that reflect *false trading*, the Commission is somehow disclosing information or market positions of a person or trade secret. Of course, information relating to false trades does not in any way disclose the business transactions, market positions, or trade secrets of any entity because the transactions never occurred, do not constitute trade secrets and do not accurately reflect any market position of any entity.

Third, the information is stale and therefore would not reflect any currently confidential information or trade secrets or market positions. This information concerns alleged trades during 2000 and 2001 – not 2009.

Finally, the Commission failed to segregate that information which is not fairly subject to the cited exemptions, to the extent those exemptions apply at all (and they do not).

## II.    ARGUMENT

The adverse determination asserts that the withheld records are exempt from release under FOIA's Exemptions 3, 4 and 7. For the reasons discussed below, this conclusion is in error. The responsive records should be released to me in full, or at a minimum in redacted form.

As an initial matter, with regard to the Exemptions, the burden of proof is on the defendant agency, which must justify its decision to withhold any information. See 5 U.S.C. § 552(a)(4)(B); *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1037 (7th Cir. 1998) ("The government bears the burden of justifying its decision to withhold the requested information pursuant to a FOIA exemption."); *Church of Scientology Int'l v. United States Dep't of Justice*, 30 F.3d 224, 228 (1st Cir. 1994) (same). The Commission has not met and cannot meet that burden here.

There are at least three reasons why the Commission's adverse determination of FOIA Request No. FY08-103 is unlawful: (1) the Commission is withholding public records maintained by the Commission in contravention of the FOIA; (2) the Commission failed to segregate records in its possession for documents responsive to the FOIA Request; and (3) the cited exemptions do not form a basis for withholding the requested documents for any number of the reasons that follow.

1011922.1

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 4

### A.    The Commission has an obligation to produce the requested documents.

The documents requested are public records maintained by the Commission that are not subject to withholding based on any recognized FOIA exception. Accordingly, the Commission is required to produce all documents that are responsive to the FOIA Request.

Under FOIA, federal agencies are required to release agency records upon receiving a request that reasonably describes such records. 5 U.S.C. § 552(a)(3)(A). For requested materials to qualify as agency records, two requirements must be satisfied. *United States DOJ v. Tax Analysts*, 492 U.S. 136, 144, 109 S. Ct. 2841 (1989). "First, an agency must either create or obtain the requested materials as a prerequisite to its becoming an agency record within the meaning of the Freedom of Information Act (FOIA)." *Id.* "Second, the agency must be in control of the requested materials at the time the FOIA request is made." *Id.*

If requested materials qualify as agency records, they must be disclosed unless they are withheld pursuant to one of the nine enumerated exceptions listed in 5 U.S.C. § 552(b). *See United States DOJ v. Julian*, 486 U.S. 1, 8, 108 S. Ct. 1606, 1611 (1988). If an agency fails to produce documents that do not fit into one of the nine enumerated exemptions, such documents "are 'improperly' withheld." *United States DOJ v. Tax Analysts*, 492 U.S. 129, 144, 109 S. Ct. 2841 (1989).

The FOIA Request is comprised of narrowly tailored requests that seek records and documents the Commission specifically requested and gathered in connection with CFTC Docket Nos. 03-03 and 03-09.[2] The records requested were specifically identified in or form the basis for statements made in the Commission's El Paso and Dynegy Orders and Findings of Fact.[3] These records and documents easily qualify as agency records. First, the requests seek documents requested and obtained by the Commission during an investigation proceeding that has been fully and finally resolved and is no longer pending. Second, the records and documents are in the Commission's control and were in the Commission's control at the time the request was made. Moreover, the requested documents satisfy the Commission's definition of public records because they are pleadings and documents that are part of the formal record of former actions and/or investigations against El Paso and Dynegy. Furthermore, the requested

---

[2] *See In the Matter of El Paso Merchant Energy, L.P.*, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 03-09 (hereinafter the "El Paso Order and Findings of Fact")(e.g., "*At the Division's request*, EPME promptly searched for and produced . . . . )(emphasis added); *In the Matter of Dynegy Marketing & Trade and West Coast Power LLC*, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 03-03 (hereinafter the "Dynegy Order and Findings of Fact"). Copies of these orders are attached collectively as Exhibit 3.

[3] *See* El Paso Order and Findings of Fact; Dynegy Order and Findings of Fact.

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 5

documents are not exempt from disclosure under any of the nine enumerated FOIA exceptions. *See* 5 U.S.C. § 552(b).

As discussed, the documents requested by FOIA Request qualify as public documents. As such, the Commission is required to produce documents responsive to that request. The Commission's failure to produce such documents is unlawful and in contravention of the FOIA.

### B.    Documents were improperly held on the basis of Exemption 3.

The Commission argues that Freedom of Information Act, 5 U.S.C. § 552(b)(3) forms a basis to withhold responsive documents pursuant to Section 8(a) of the Commodity Exchange Act, 7 U.S.C. § 12. Specifically, the Commission represents that it may withhold documents under Exemption 3 and Section 8(a) because "the Commission 'may not publish data and information that would separately disclose the business transactions or market positions of any person and trade secrets or names of customers, and any date or information concerning or obtained in connection with any pending investigation of any person.'"

The Commission's withholding of responsive documents in reliance on 8(a) is improper as evidenced by the clear language of the statute.[4] First, the data requested does not "separately disclose the business transactions or market positions of any person." To the contrary, the FOIA Request requests information about *false transactions* that were reported to trade indices. This information in no way reflects a "business transaction" and most certainly does not reflect the market position of Dynegy or El Paso. Moreover, for the same reasons, the information cannot be said to constitute a trade secret nor does the information identify the name of any true customers.

Further, to the extent the Commission has in its control documents that reflect ***actual*** business transactions that occurred eight or nine years ago, such information no longer reflects the market position of Dynegy or El Paso, and most certainly is no longer a trade secret that retains any competitive value due to, among other things, its age and the vast changes in the market since the time the information was provided to the Commission. Additionally, with respect to documents that reflect any ***actual*** trades of Dynegy and El Paso, certain of these documents have already been made public or are due to be made public by the Federal Energy Regulatory Commission. Therefore, the documents do not "separately disclose the business transactions or market positions" nor do they constitute "trade secrets" since they are already or are due to be made publicly available.[5] *See* http://www.ferc.gov/industries/electric/indus-

---

[4] We have assumed only for the purposes of this letter that Section 8(a) actually forms a basis for withholding pursuant to Exemption 3. However, we dispute that Section 8(a) forms such basis for withholding.

[5] On March 21, 2003, the Federal Energy Regulatory Commission ("FERC") issued an order in which it directed the release of information gathered in the PA02-2 docket. *Fact Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, 102 FERC ¶ 61,311 (2003) (the "March 21 Order"). FERC's investigation involved virtually identical facts -- the reporting of false information by, among others, Dynegy and El

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 6

---

Paso to trade indices. Dynegy and El Paso both submitted information to FERC regarding its trades. In the order directing the release of documents, FERC stated rationale was that the release of the information was "necessary and in the public interest." *Id.* at p. 6. FERC explained that a Staff Report in Docket No. PA02-2-000 was imminently forthcoming, and:

> [T]herefore, the release of the information now will enable the public to understand better the evidentiary record on which the Commission's decisions in those proceedings are grounded. Also, any further proceedings in these matters addressing information in the instant dockets will benefit from the release of the information, which will assist in framing the issues and in expeditious resolution of such cases. The crisis in the 2000-2001 western energy markets, in particular in California, has been the subject of many state and Federal inquiries and investigations that have implicated the market information.

*Id.* In connection with concerns expressed to FERC about a certain "lack of transparency" and "an atmosphere of suspicion and misinformation," FERC stated that "release of the information will now allow the public a clearer view of the basis for [FERC's] determinations that are currently pending and subject to resolution in the near future." *Id.* at p. 7.

On rehearing of ensuing orders on release and re-release and in response to motions seeking limits on released information, the Commission emphasized its commitment to making PA02-2-000 information public, reiterating "as the Commission has previously stated, the Commission intended to release as much information as possible to enable the public to understand better the bases for its determinations in the report on the Enron investigation issued the same day as the information was released and other decisions that might flow from that report." *Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, 105 FERC ¶ 61,205, p. 19 (2003). FERC noted as well that "such information included evidence discussed in the Final Staff Report issued in Docket No. PA02-2-000...." *Id.*

On further rehearing of ensuing orders, FERC again made clear its determination to make public all information under PA02-2, with very limited exception:

> [T]he Commission has endeavored to ensure that all relevant information collected during the PA02-2-000 investigation, with very limited exceptions related to ongoing criminal investigations, be accessible by members of the public. In fact, in response to a recent request filed pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2003), Commission staff discovered some enforcement documents obtained in Docket No. PA02-2-000 [FN: The FOIA request sought, among other things, copies of all documents or files concerning or relating to the Commission's investigation of the natural gas markets submitted in reference to wash trading or false reporting of trade and volume information]. A detailed index of these documents was circulated to the appropriate Federal agencies to determine if the documents were appropriate for release. Then, those documents that were appropriate for release were promptly placed on the Commission's web site. All public information regarding Docket No. PA02-2-000 is accessible via the Commission's we site at: http://www.ferc.gov/industries/electric/indus-act/wem/pa02-2/info-release.asp

*Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, 107 FERC ¶ 61,108, P 26 (2004). Although FERC has not made all documents publicly available yet (the undersigned currently has an appeal pending before FERC due to FERC's failure to make all documents responsive to a FOIA request available pursuant to FERC's own order), certain actual trades of El Paso and Dynegy have already been disclosed. *See* http://www.ferc.gov/industries/electric/indus-act/wec/enron/info-release.asp (click hotlink to: Western Sellers

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 7

act/wec/enron/info-release.asp (click hotlink to: Western Sellers Submissions - Corrected and
validated long-term transactions (used in regression analysis) submitted in response to the March
5, 2002 FERC letter order to all jurisdictional and non-jurisdictional sellers with wholesales sales
in US portion of Western Systems Coordinating Council.)

Finally, there no longer exists a "pending investigation." The Commission fully and
finally settled any potential claims over the facts at issue.

### C.   Documents were improperly held on the basis of Exemption 4.

The adverse determination makes the conclusory assertion that the requested and
responsive documents are due to be withheld pursuant to the Freedom of Information Act, 5
U.S.C. § 552(b)(4). Irrespective of the fact that the Commission failed to identify its reason for
relying on (b)(4), for whatever reason, the Commission's conclusion that (b)(4) provides a basis
for withholding is in error.

For example, to the extent the Commission attempts to rely on the "competitive harm"
basis to withhold documents under (b)(4), the Commission made no attempt in the adverse
determination to even describe what entity will be likely harmed or how it would be harmed if
the Commission disclosed documents that relate to **false transactions** reported by Dynegy and
El Paso to trade publications. Because the reported transactions never actually occurred, they do
not reflect the legitimate business transactions or the market position of El Paso or Dynegy and
cannot possibly be used in any meaningful way by a competitor to compete with Dynegy or El
Paso. The documents submitted by these companies do not meet the test for Exemption 4
because those submitters do not face actual competition in connection with fictitious transactions
they reported to trade publications eight or nine years ago. *See, e.g., Niagara Mohawk Power v.
U.S. DOE*, 169 F.3d 16 (D.C. Cir. 1999) (holding that Exemption 4 only applies if (1) the
submitter actually faces competition and (2) substantial competitive injury would likely result
from disclosure).

Moreover, the adverse determination does nothing more than make conclusory
allegations that the records are due to be withheld under Exemption 4. Such conclusions are not
sufficient to support a withholding under Exemption 4. *See, e.g., Pub. Citizen Health Research
Group v. FDA*, 185 F.3d 898, 906 (D.C. Cir. 1999); ("[C]onclusory and generalized allegations
of substantial competitive harm . . . cannot support an agency's decision to withhold requested
documents."); *Nw. Coalition for Alternatives to Pesticides v. Browner*, 941 F. Supp. 197, 202

Submissions - Corrected and validated long-term transactions (used in regression analysis) submitted in response to
the March 5, 2002 FERC letter order to all jurisdictional and non-jurisdictional sellers with wholesales sales in US
portion of Western Systems Coordinating Council.)

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 8

(D.D.C. 1996) (same); *Lykes Bros. S.S. Co. v. Pena*, No. 92-2780, slip op. at 13 (D.D.C. Sept. 2, 1993) (declaring that submitters are "required to make assertions with some level of detail as to the likelihood and the specific nature of the competitive harm they predict") (reverse FOIA suit); *see also In Def. of Animals v. HHS*, No. 99-3024, slip op. at 21 (D.D.C. Sept. 28, 2001) (rejecting agency's "conclusory and vague statements" which provided "little more than speculation about potential problems in securing future contracts").

The adverse determination also does not describe how market trading information that is over eight or nine years old can be of significant competitive value, nor can the Commission dispute that the current operating environment in the gas markets is different from 2000-2001 time period. *Lee v. FDIC*, 923 F. Supp. 451, 455 (S.D.N.Y. 1996) (rejecting competitive harm argument because "financial information in question is given for [a period two years previously] and any potential detriment which could be caused by its disclosure would seem likely to have mitigated with the passage of time"); *Garren v. United States Dep't of the Interior*, No. CV-97-273, slip op. at 19-20 (D. Or. Nov. 17, 1997) (magistrate's recommendation), *adopted* (D. Or. Jan. 8, 1998) (rejecting competitive harm claim for sales prices for concessions sold "seven or eight years" ago, finding that "price may be different for future transactions involving other parties and other companies and, potentially, a different operating environment").

In addition, much of the ***actual*** trading information has already been made available by FERC,[6] so no credible claim of Exemption 4 protection is possible. *See Anderson v. HHS*, 907 F.2d 936, 952 (10th Cir. 1990) (declaring that "no meritorious claim of confidentiality" can be made for documents that are in the public domain); *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987) (holding that "[t]o the extent that any data requested under [the] FOIA are in the public domain, the submitter is unable to make any claim to confidentiality—a *sine qua non* of Exemption 4"); *Cont'l Stock Transfer & Trust Co. v. SEC*, 566 F.2d 373, 375 (2d Cir. 1977) (concluding that "[n]o cognizable harm, much less any substantial harm," would occur from the release of information "almost all" of which already was readily available to the public). The information in the documents withheld is clearly no secret within the industry, and thus the withholding in this case is contrary to law under either the competitive harm test or the *Critical Mass* test for voluntarily submitted information, to the extent such information was even voluntarily submitted – a point which we dispute.

Finally, the Commission has not explained how the submissions by any of the submitters of documents could be considered "voluntary" when the Commission "requested" the information and instituted public administrative proceedings. *See, e.g.,* Request to All Sellers of Natural Gas in the U.S. Portion of the Western Systems Council, PA02-2-000 (May 22, 2002).

---

[6] See http://www.ferc.gov/industries/electric/indus-act/wec/enron/info-release.asp (click hotlink to: Western Sellers Submissions  - Corrected and validated long-term transactions (used in regression analysis) submitted in response to the March 5, 2002 FERC letter order to all jurisdictional and non-jurisdictional sellers with wholesales sales in US portion of Western Systems Coordinating Council.)

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 9

*See Lepelletier v. FDIC*, 977 F. Supp. 456, 460 n.3 (D.D.C. 1997) ("Information is considered 'required' if any legal authority compels its submission, including informal mandates that call for the submission of the information as a condition of doing business with the government."), *aff'd in part, rev'd in part & remanded on other grounds*, 164 F.3d 37 (D.C. Cir. 1999); *see also Lykes Bros. S.S. Co. v. Pena*, No. 92-2780, slip op. at 8-11 (D.D.C. Sept. 2, 1993) (submission "compelled" both by agency statute and by agency letter sent to submitters).

### D.    Exemption 7

The adverse determination also fails to adequately demonstrate that the withheld records are protected by Exemption 7. Exemption 7 does not protect records simply because they are "compiled for law enforcement purposes." The records must also satisfy one of the six subparts of the Exemption (A through F). The adverse determination fails to satisfy the Commission's obligation to show specifically how any of these subparts are satisfied. For example, the courts have held that the mere pendency of enforcement proceedings is an inadequate basis for the invocation of Exemption 7(A); the government must also establish that some distinct harm could reasonably be expected to result if the record or information requested were disclosed. *Miller v. USDA*, 13 F.3d 260, 263 (8th Cir. 1993) (holding that government must make specific showing of why disclosure of documents could reasonably be expected to interfere with enforcement proceedings); *Crooker v. ATF*, 789 F.2d 64, 65-67 (D.C. Cir. 1986) (finding that agency failed to demonstrate that disclosure would interfere with enforcement proceedings); *Grasso v. IRS*, 785 F.2d 70, 77 (3d Cir. 1986) (stating that "government must show, by more than conclusory statement, how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding"). In the present matter, the Commission has provided no such specific showing as to what harm would result to its enforcement efforts if the requested records were released.

The Commission has also not satisfied the test for Exemption 7(B): (1) that a trial or adjudication is pending or truly imminent; and (2) that it is more probable than not that disclosure of the material sought would seriously interfere with the fairness of those proceedings. *Washington Post Co. v. United States Department of Justice*, 863 F.2d 96, 102 (D.C. Cir. 1988). *See also Alexander & Alexander Servs. v. SEC*, No. 92-1112, 1993 WL 439799, at **10-11 (D.D.C. Oct. 19, 1993) (citing *Wash. Post* to find that company "failed to meet its burden of showing how release of <u>particular</u> documents would deprive it of the right to a fair trial"). The second part of this test requires Commission to demonstrate that the release of the 6 CD's and approximately 4,057 pages of withheld documents would likely produce unfairness to the companies the Commission previously investigated. Because the Commission and its staff already have access to the documents in question and there is no indication that the Commission or staff would lack impartiality if the documents were released, this test simply is not satisfied

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 10

here. Moreover, it is clear that the trial or adjudication is not pending, since the Commission already agreed to a "full and final settlement" of the claims and facts at issue.[7]

With regard to Exemption 7(E), the Commision has utterly failed to show what specific law enforcement "techniques and procedures" or "guidelines" could possibly be disclosed by release of documents submitted to the Commision by a private company. The only possible "technique" or "procedure" at issue here is the Commission's ability to compel the production of documents. Because it is no secret that the Commission requested the documents and that El Paso and Dynegy provided those documents to the Commission, Exemption 7(E) does not apply. *See* Attorney General's 1986 Amendments Memorandum at 16 n.27 (citing S. Rep. No. 98-221, at 25 (1983) (citing, in turn, H.R. Rep. No. 93-180, at 12 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267)); *see also Campbell v. United States Dep't of Justice*, No. 89-3016, slip op. at 6 (D.D.C. Aug. 6, 1997) (declaring that Exemption 7(E) applies to "obscure or secret techniques"), *rev'd & remanded on other grounds*, 164 F.3d 20 (D.C. Cir. 1998). Moreover, it is inexplicable how documents from private entities could reveal "guidelines for law enforcement investigations or prosecutions [the disclosure of which] could reasonably be expected to risk circumvention of the law."

### E.    Reasonably Segregable Non-exempt Portions

Separate and apart from its utter failure to justify its withholding under either Exemption 3, 4 or 7, the Commission failed to release all reasonably segregable non-exempt portions of the withheld records. FOIA unequivocally states that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such a record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). As the Department of Justice has explained, "this important provision was designed to narrow the focus of the application of exemptions from documents to specific segments of information within them." DOJ FOIA Guide at 792; *see also Schiller v. N.L.R.B.*, 964 F.2d 1205, 1209 (D.C. Cir. 1992)("The focus in the FOIA is information not documents and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."). The "segregability requirement applies to all documents and exemptions in the FOIA." *Center for Auto Safety v. E.P.A.*, 731 F.2d 16, 21 (D.C. Cir. 1984).

It is incumbent upon the Commission in the first instance to consider whether it is possible to redact requested information in order to avoid application of an Exemption. *Piper & Marbury, L.L.P. v. United States Postal Serv.*, No. 99-2383, 2001 WL 214217, at *4 (D.D.C. Mar. 6, 2001) (magistrate's recommendation) (recommending full disclosure of contract when agency broadly claimed that it was exempt in its entirety; finding instead that Exemption 4 protects "particular knowledge, facts, or data, rather than entire documents"), *adopted*, No. 99-

---

[7] The El Paso Order and Findings of Fact, at 1; the Dynegy Order and Findings of Fact, at 1.

BALCH & BINGHAM LLP

Freedom of Information Act
January 8, 2008
Page 11

2383, slip op. at 4 (D.D.C. Mar. 30, 2001) (holding that "[i]n this circuit, an entire document simply does not qualify as 'information' ex[em]pted from disclosure under" the FOIA; concluding that although "particular 'information' may be redacted upon an adequate showing," the agency had "not pursued such a course in this case"; and, consequently, ordering release of the contract in its entirety), *reconsideration denied* (D.D.C. Feb. 28, 2002).

The Commission is due, at a minimum, to reasonably segregate non-exempt portions of the withheld records.

We look forward to addressing these issues in the lawsuit pending against the Commission in the United States District Court for the Northern District of Alabama. Please call or e-mail with any questions.

Best regards,

A. Kelly Brennan

AKB:dl

cc:   FOIA Compliance Office, Commodity Futures Trading Commission
      Stuart C. Plunkett (El Paso)
      Michael J. Kass (Dynegy)

# EXHIBIT 1



**U.S. COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
Telephone: (202) 418-5105
Facsimile: (202) 418-5124

FOIA
Compliance Office

December 10, 2008

**VIA kbrennan@balch.com**
Kelly Brennan, Esq.
Balch & Bingham LLP
P.O. Box 306
Birmingham, AL 35201-0306

> FOIA No.: 08-0141
> RE: All documents relied upon by the CFTC regarding various statement(s) made in the
> Order Instituting Proceedings Making Findings and Imposing Remedial Sanctions in
> CFTC docket no.: 03-09 and 03-03 (re: Dynegy & El Paso).

Dear Ms. Brennan:

This letter is in final response to your September 15, 2008, Freedom of Information Act request for the above information.

By letter dated November 6, 2008, we informed you that attorneys for Dynegy, Inc. and El Paso Merchant Energy, LP had filed requests for confidential treatment of material responsive to your FOIA request and that they had been asked to submit a detailed written justification in support of their requests.

Commission staff has reviewed the detailed written justification and has determined to grant confidential treatment in full. The 6 CD's and approximately 4,057 pages of documents responsive to your request are being withheld pursuant to exemption 3 of the Freedom of Information Act, 5 U.S.C. § 552 (b)(3), pertaining to material specifically exempted from disclosure by statute (Section 8(a) of the Commodity Exchange Act, 7 U.S.C. § 12, which states that the Commission "may not publish data and information that would separately disclose the business transactions or market positions of any person and trade secrets or names of customers, and any data or information concerning or obtained in connection with any pending investigation of any person"); exemption (b)(4) of the Freedom of Information Act, 5 U.S.C. § 552 (b)(4), pertaining to commercial or financial information that is privileged or confidential; and exemption 7 of the Act, 5 U.S.C. § 552 (b)(7)(A)(B)(E), pertaining to records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with pending enforcement proceedings, would deprive a person of a right to a fair trial, and would disclose techniques and procedures for law enforcement investigations or prosecutions, if such disclosure could reasonably be expected to risk circumvention of the law.

You may, if you wish, file an appeal for access to information denied you by this letter. Your appeal must be filed within 30 days of the date of this letter. Your appeal must be in writing and must contain a statement of the grounds upon which you are basing your appeal. Please refer to the FOIA number that has been assigned to this request (FOIA No. 08-0141). Your appeal should be addressed: Freedom of Information Act Appeal, Office of the General Counsel, Commodity Futures Trading Commission, Three Lafayette Centre, 8th Floor, 1155 21st Street, N.W., Washington, D.C. 20581. Please send a copy of your appeal to the FOIA Compliance Office, Commodity Futures Trading Commission, Three Lafayette Centre, 8th Floor, 1155 21st Street, N.W., Washington, D.C. 20581. Commission regulation requires that you also send a copy of your appeal to the submitters: Stuart C. Plunkett (El Paso), Morrison & Foerster LLP, 425 Market Street, San Francisco, California, 94105; and Michael J. Kass (Dynegy), Pillsbury Winthrop Shaw Pittman LLP, P.O. Box 7880, San Francisco, California, 94120-7880. Questions concerning the processing of an appeal should be directed to the Office of the General Counsel at (202) 418-5120.

Please direct any questions you may have regarding the initial processing of your request to me at (202) 418-5011 or seaster@cftc.gov.

Sincerely,

Stacy J. Easter
Paralegal Specialist

# EXHIBIT 2



**U.S. COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
Telephone: (202) 418-5105
Facsimile: (202) 418-5124

FOIA
Compliance Office

November 6, 2008

Kelly Brennan, Esq.
Balch & Bingham LLP
P.O. Box 306
Birmingham, AL 35201-0306

FOIA No.: 08-0141
RE: All documents relied upon by the CFTC regarding various statement(s) made in the
Order Instituting Proceedings Making Findings and Imposing Remedial Sanctions in
CFTC docket no.: 03-09 and 03-03 (re: Dynegy & El Paso).

Dear Ms. Brennan:

This letter is in partial response to your September 15, 2008, Freedom of Information Act
request for the above information.

Staff of the Division of Enforcement has identified material responsive to your request
and has determined that your request should be denied in total. Nine hundred and ninety-seven
pages consisting of internal memoranda and e-mails are being withheld pursuant to exemption 3
of the Freedom of Information Act, 5 U.S.C. § 552 (b)(3), pertaining to material specifically
exempted from disclosure by statute (Section 8(a) of the Commodity Exchange Act, 7 U.S.C. §
12); exemption 5, 5 U.S.C. § 552(b)(5), pertaining to interagency or intra-agency memos or
letters, which would not be available by law to a party other than an agency in litigation with the
agency; and exemption 7 of the Act, 5 U.S.C. § 552 (b)(7)(A), pertaining to records or
information compiled for law enforcement purposes, but only to the extent that the production of
such law enforcement records or information could reasonably be expected to interfere with
pending enforcement proceedings.

Please be advised that Commission staff has identified additional material that is subject to
petition for confidential treatment pursuant to Section 145.9 of the Commission's regulations. In
accordance with Section 145.9(d)(7), the submitters (Dynegy Inc. & El Paso Merchant Energy LP)
of the confidential treatment requests were notified that a Freedom of Information Act request for
the material had been received and had been asked to submit a detailed written justification in
support of their confidential treatment request. We have received the justifications (attached) and
staff is currently reviewing them to determine whether the request for confidential treatment
should be granted or denied. You will be promptly notified when staff has made its
determination.

Once the confidential treatment process is resolved, you may, if you wish, file an appeal

for access to information denied you by this letter.  Please do not file your appeal until you receive a final response to your request.  Your appeal must be in writing and must contain a statement of the grounds upon which you are basing your appeal.  Please refer to the FOIA number that has been assigned to this request (FOIA No. 08-0141).  Your appeal should be addressed:  Freedom of Information Act Appeal, Office of the General Counsel, Commodity Futures Trading Commission, Three Lafayette Centre, 8th Floor, 1155 - 21st Street, N.W., Washington, D.C.  20581.  Please send a copy of your appeal to the FOIA Compliance Office, Commodity Futures Trading Commission, Three Lafayette Centre, 8th Floor, 1155 - 21st Street, N.W., Washington, D.C.  20581.  Questions concerning the processing of an appeal should be directed to the Office of the General Counsel at (202) 418-5120.

Please direct any questions you may have regarding the initial processing of your request to me at (202) 418-5011 or seaster@cftc.gov.

Sincerely,

Stacy J. Easter
Paralegal Specialist

2

# EXHIBIT 3

UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSIONS



|  |  |
|---|---|
| ) | |
| ) | |
| ) | CFTC Docket No.: 09-12 |
| **In the Matter of:** ) | |
| ) | **ORDER INSTITUTING** |
| **EL PASO MERCHANT ENERGY, L.P.,** ) | **PROCEEDINGS PURSUANT TO** |
| ) | **SECTIONS 6(c) AND 6(d) OF THE** |
| ) | **COMMODITY EXCHANGE ACT,** |
| ) | **MAKING FINDINGS AND** |
| **Respondent.** ) | **IMPOSING REMEDIAL SANCTIONS** |
| ) | |
| ) | |
| ) | |
| ) | |

I.

The Commodity Futures Trading Commission ("Commission") has reason to believe that El Paso Merchant Energy, L.P. ("EPME"), a business unit of El Paso Corporation ("El Paso"), has violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2000). Further, the Commission has reason to believe that EPME has violated Commission Regulations 1.31, 1.35 and 1.40, 17 C.F.R. §§ 1.31, 1.35 and 1.40 (2002). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether EPME ("Respondent") engaged in the violations set forth herein, and to determine whether any order should be issued imposing remedial sanctions.

II.

In anticipation of the institution of an administrative proceeding, the Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Without admitting or denying the findings of fact herein, the Respondent consents to the entry of this Order in full and final settlement of any alleged violations of the above referenced laws or regulations solely as they relate to the activities and conduct described in Section C below and acknowledge service of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order"). Respondent

consents to the use by the Commission of the findings herein in the proceeding brought by the Commission and in any other proceeding brought by the Commission or to which the Commission is a party.[1]

## III.

The Commission finds the following:

### A.    SUMMARY

From at least June 2000 through November 2001 (the "Relevant Period"), EPME reported false natural gas information, including price and volume information about natural gas cash transactions it purportedly made, to certain reporting firms and thereby attempted to manipulate the natural gas market. Price and volume information is used by reporting firms in calculating published indexes of natural gas prices for various pipeline hubs throughout the United States. During the relevant period, EPME knowingly reported non-existent trades to the reporting firms while at the same time withholding information about actual trades it had made from the reporting firms. EPME did so in an attempt to skew those indexes to Respondent's financial benefit.

In addition, EPME did not maintain certain required records concerning the information it provided to the reporting firms as required by Commission Regulations.

The settlement in this matter takes into consideration the nature and extent of cooperation provided to the Commission staff investigating this matter. Prior to the Division of Enforcement ("Division") discovering violative conduct, EPME initiated an internal investigation by hiring an independent law firm to conduct a timely investigation relating to false reports to price gathering and reporting services. In voluntarily providing the Commission with this information, EPME waived certain claims of work product privilege for the limited purpose of cooperating with the Commission. Subsequently, EPME voluntarily provided Commission staff with interview reports of current and former EPME traders and analyzed and compiled trading data, which detailed all reported and all actual trades in the natural gas markets. At the Division's request, EPME promptly searched for and produced, on a voluntary basis, e-mails and audio recordings. These productions were voluminous and were produced in an organized and user-friendly format. At the Division's request, EPME voluntarily produced a senior risk manager to explain its risk management operations. Finally, after uncovering the violative conduct, El Paso decided to cease trading operations and the employees responsible for the activities referenced above are no longer with the Company.

---

[1] Respondent does not consent to the use of its Offer or the findings in this Order as the sole basis for any other proceeding brought by the Commission, other than a proceeding brought to enforce the terms of this Order. Respondent does not consent to the use of the Offer or the findings in this Order by any other person or entity in this or any other proceeding. The findings made in this Order are not binding on any other person or entity, including, but not limited to, any person or entity named as a defendant or respondent in any other proceeding.

The sanctions imposed by this order take EPME's voluntary disclosures and its early and consistent cooperation into consideration.    Absent that cooperation, the Commission likely would have imposed a more severe sanction.  We have previously noted that we take the respondent's level of cooperation into consideration in evaluating settlement offers.  *See In re Sumitomo Corp.* 1998 WL 236520 (CFTC May 11, 1998) (respondent's cooperation included voluntary production of documents that the Commission might not have been able to obtain from a foreign corporation).

## B.    RESPONDENT

**El Paso Merchant Energy, L.P.** is a limited partnership organized and existing under the laws of the State of Delaware and is a business unit of El Paso.[2]  During all times relevant herein, it was EPME's function to conduct El Paso's marketing and trading of natural gas and power generation, *i.e.*, the company's merchant energy activities. EPME is a non-clearing member of the New York Mercantile Exchange ("NYMEX"), a designated contract market, and during the relevant period, was a large trader in NYMEX natural gas futures and options contracts on NYMEX.

## C.    FACTS

### 1.    Gas Market Participants' Use of Information from Reporting Firms

During the Relevant Period, reporting firms compiled and published indexes of natural gas prices for natural gas hubs throughout the United States.  The indexes were calculated based upon trading information, including volume and price information, collected by the reporting firms from market participants.  Participants in the natural gas markets use these indexes to price and settle commodity transactions.  Moreover, natural gas futures traders refer to the prices published by the reporting firms for price discovery and for assessing price risks.   For instance, an increase in prices at a natural gas trading hub signals either stronger demand or weakened supply and futures traders take account of both price movements and changes in the supply/demand balance when conducting their futures trading.

### 2.    EPME Reported False Market Information

From at least June 2000 through November 2001, Respondent provided false reports to the reporting firms and failed to keep copies of required reports.[3]  The false reports included altering price and volume of actual trades and reporting nonexistent trades using

---

[2] El Paso Corporation is a Delaware corporation headquartered at 1001 Louisiana Street, Houston, Texas. It is one of the largest North American providers of natural gas services, with core businesses in natural gas production, gathering and processing, transmission, as well as liquefied natural gas transport and receiving, petroleum logistics, power generation and merchant energy services.

[3] Certain EPME employees claimed to have reported to EPME's "book bias", meaning that EPME traders reported transactions that would benefit the firm's net long or short position, regardless of what actual trades had transpired.

3

telephones, faxes, and the Internet. Respondent's employees provided false trade data because they believed that it benefited their trading positions or derivatives contracts. Respondent also failed to report actual trades to the reporting firms.

## D.    LEGAL DISCUSSION

### 1.    By Reporting False Market Information, EPME Violated Section 9(a)(2) of the Act

Section 9(a)(2) of the Act makes it unlawful for any person "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce[.]" *See, e.g., United Egg Producers v. Bauer Int'l Corp.*, 311 F. Supp. 1375, 1383 (S.D.N.Y. 1970) (concluding that false press releases regarding egg importation "tended to affect the price of eggs in interstate commerce"); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1046 (N.D. Ill. 1995) (concluding that false reports can influence prices and constitute part of a manipulation claim).

Respondent violated Section 9(a)(2) of the Act when its employees knowingly delivered false price and volume information, including nonexistent trades, to the reporting firms.[4]  As discussed above, price and volume information affect or tend to affect the market price of natural gas, including futures prices as traded on the NYMEX. As such, Respondent violated Section 9(a)(2) of the Act.

### 2.    By Attempting to Manipulate Prices, EPME Violated Sections 6(c), 6(d) and 9(a)(2) of the Act

Sections 6(c) and 6(d) of the Act together authorize the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person ... has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity ... or otherwise is violating or has violated any of the provisions of [the] Act." Section 9(a)(2) provides that it is unlawful for "[a]ny person to manipulate or attempt to

---

[4] Under Section 2(a)(1)(B) of the Act and Section 1.2 of the Commission's Regulations, the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust. "[I]t does not matter if the principal participated in or even knew about the agent's acts; he is strictly liable for them." *Stotler and Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988) (citing *Cange v. Stotler*, 826 F. 2d 581, 589 (7th Cir. 1987); *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966-67 (7th Cir. 1986)).  Consequently, EPME is liable for its employees' violations of the Act and Commission Regulations.

4

manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to corner or attempt to corner any such commodity."

The following elements generally are required to show an attempted manipulation: (1) an intent to affect the market price; and (2) some overt act in furtherance of that intent. *See In re Abrams*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,479 at 43,136 (CFTC July 31, 1995). *See also In re Hohenberg Bros. Co.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977). To prove the intent element of manipulation or attempted manipulation, it must be shown that EPME "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *In re Indiana Farm Bureau Cooperative Association*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,281 (CFTC Dec. 17, 1982). "[I]ntent is the essence of manipulation." *Id.* at 27,282.

Respondent specifically intended to report false or misleading or knowingly inaccurate market information concerning, among other things, trade prices and volume of trading, and failed to report actual market information in an attempt to manipulate the price of natural gas in interstate commerce. Respondent's provision of the false reports and failure to report actual trades constitute overt acts in furtherance of the attempted manipulation. By so doing, Respondent's conduct constitutes an attempted manipulation under Section 9(a)(2) of the Act, which, if successful, could have affected prices of NYMEX natural gas futures contracts.

### 3. EPME's Failure to Retain Trading Records Violated Commission Regulations 1.31, 1.35 and 1.40

EPME, a non-clearing NYMEX member, failed to keep certain records required of members of a contract market, including records of what EPME relayed to the reporting firms. Together, Commission Regulations 1.31, 1.35 and 1.40, 17 C.F.R. §§ 1.31, 1.35 and 1.40, required EPME to maintain and to produce upon request to the Commission certain records. Commission Regulations 1.31 and 1.35 required EPME to maintain and to produce "full, complete, and systematic records, together with all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity futures, commodity options, and cash commodities." In addition, Regulation 1.40 further requires that: "[E]ach member of a contract market shall, upon request, furnish or cause to be furnished to the Commission a true copy of any letter, circular, telegram, or report published or given general circulation by such ... member which concerns crop or market information or conditions that affect or tend to affect the price of any commodity, and the true source of or authority for the information contained therein."

By failing to keep the required records, including records of what EPME relayed to the reporting firms, EPME violated Commission Regulations 1.31, 1.35 and 1.40. As

discussed above, price and volume information affect or tend to affect the market price of natural gas, including futures prices as traded on the NYMEX.

## IV.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Respondent violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, 13(a)(2) and 15 (2000), and Commission Regulations 1.31, 1.35 and 1.40, 17 C.F.R. §§ 1.31, 1.35 and 1.40 (2002).

## V.

## OFFER OF SETTLEMENT

Respondent has submitted an Offer of Settlement in which, without admitting or denying the allegations or the findings herein: acknowledges service of the Order; admits jurisdiction of the Commission with respect to the matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based upon violations or for enforcement of the Order; waives service and filing of a complaint and notice of hearing, a hearing, all post-hearing procedures, judicial review by any court, any objection to the staff's participation in the Commission's consideration of the Offer, any claim of double jeopardy based on the institution of this proceeding or the entry of any order imposing a civil monetary penalty or other relief, and all claims which it may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (1994) and 28 U.S.C. § 2412 (1996), as amended by Pub. L. No. 104-21, §§ 231-32, 110 Stat. 862-63, and Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1 *et seq.* (2002), relating to, or arising from, this action; stipulates that the record basis on which this Order is entered consists solely of this Order, including the findings in this Order; and consents to the Commission's issuance of this Order. Pursuant to the Offer of Settlement herein, EPME and El Paso both agree to entry of an Order, in which the Commission makes findings, including findings that EPME violated Sections 6(c), 6(d), and 9(a)(2) of the Act and violated Commission Regulations 1.31, 1.35 and 1.40 and orders that Respondent cease and desist from violating the provisions of the Act and Commission Regulations it has been found to have violated, and agrees to a civil monetary penalty of twenty million dollars ($20,000,000) and that it complies with the conditions and undertakings as set forth in this Order.

## VI.

Accordingly, IT IS HEREBY ORDERED THAT:

1.    EPME shall cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act and Commission Regulations 1.31, 1.35 and 1.40;

2.    EPME and/or El Paso shall:

(a)    Jointly and severally, pay a civil monetary penalty of twenty million dollars ($20,000,000), hereafter "the Penalty." Respondent and/or El Paso shall pay the Penalty in accordance with the following terms:

(i)    Pay ten million dollars ($10,000,000) of the Penalty within five (5) business days of the entry of this Order and make such payment by electronic funds transfer to the account of the Commission at the United States Treasury or by certified check or bank cashier's check made payable to the Commodity Futures Trading Commission and addressed to Dennese Posey, or her successor, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581, under cover of a letter that identifies the Respondent and the name and docket number of this proceeding. Copies of the cover letter and the form of payment shall be simultaneously transmitted to Gregory G. Mocek, Director, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581, and to Rosemary Hollinger, Regional Counsel, 525 West Monroe Chicago, IL 60661;

(ii)    Pay ten million dollars ($10,000,000) of the Penalty within three (3) years of the entry of this order, plus post-judgment interest accruing from the date of this Order until the Penalty is paid in full, at the Treasury Bill rate prevailing on the date of this Order, pursuant to 28 U.S.C. § 1961(a).

If payment is not made in accordance with the requirements of this paragraph, the Respondent and El Paso shall be subject to further proceedings pursuant to Section 6(c) and Section 6(e)(2) of the Act, 7 U.S.C. § 9 and 9a(e)(2) (2001), for violating a Commission Order;

3.    Respondent and/or El Paso shall comply with the following conditions and undertakings as specified:

(a)    Cooperation With The Commission

Respondent and El Paso shall continue to cooperate fully and expeditiously with the Commission, and its staff, including the Division, in this proceeding and any investigation, civil litigation, or administrative matter related to the subject matter of this proceeding or any current or future Commission investigation relating to manipulation or false reporting to or from a price index. Respondent and El Paso agree to cooperate fully and expeditiously with the Division's ongoing efforts to discover documents and information related to reporting energy prices to energy reporting services. Respondent and El Paso agree that this undertaking includes the Respondent in this proceeding and any El Paso subsidiary or affiliate within its control. As part of such cooperation, Respondent and El Paso agree to comply fully, promptly, and truthfully to any inquiries or requests for information, including but not limited to: (1) requests for authentication of

7

documents; and (2) requests for any documents within Respondent's or El Paso's possession, custody, or control, including inspection and copying of documents. Respondent and El Paso further commit to producing their current (as of the date of the request) officers, directors, agents and employees, regardless of the individual's location, for interviews, depositions, and testimony at any administrative or judicial hearing related to the subject matter of this proceeding and to encourage them, to testify completely and truthfully at such proceeding. Respondent and El Paso also agree to assist the Division in locating and contacting any prior (as of the time of the request) officer, director, or employee of Respondent. Respondent and El Paso also agree that they will not undertake any act that would limit their ability to fully cooperate with the Commission. Respondent and El Paso designate Kenneth Raisler, Esq., of the Sullivan & Cromwell law firm to receive all requests for information pursuant to this undertaking. Should Respondent or El Paso seek to change the designated person to receive such requests, notice shall be given to the Division of such intention 14 days before it occurs. Any person designated to receive such request shall be located in the United States.

    (b)   Public Statements

By neither admitting nor denying the findings of fact, Respondent and El Paso agree that neither they nor any of Respondent's or El Paso's agents or employees under their authority and control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in the Order or creating, or tending to create, the impression that the Order is without factual or legal basis; provided, however, that nothing in this provision shall affect Respondent's and El Paso's: (i) testimonial obligations; or (ii) right to take factual or legal positions in other proceedings to which the Commission is not a party. Respondent and El Paso will undertake all steps necessary to assure that all of their agents and employees under their authority and control understand and comply with this agreement.

    (c)   Miscellaneous Provisions

    (i)   This Order shall inure to the benefit of and be binding on El Paso Corporation and Respondent's and El Paso's successors, assigns, beneficiaries and administrators.

    (ii)   If Respondent or El Paso fail to comply with any of the conditions or undertakings of this Order, the Respondent and El Paso shall be subject to further proceedings pursuant to Section 6(c) and Section 6(e)(2) of the Act, 7 U.S.C. § 9 & 9a(e)(2) (2001), for violating a Commission Order.

By the Commission.

Jean A. Webb<br>
Secretary of the Commission<br>
Commodity Futures Trading Commission

Dated: March 26, 2003

UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

|  |  |
|---|---|
| In the Matter of: | ) |
|  | ) |
|  | ) |
|  | ) |
| Dynegy Marketing & Trade and | ) |
| West Coast Power LLC | ) |
|  | ) |
|  | ) |
| Respondents. | ) |
|  | ) |
|  | ) |

CFTC Docket No.: 03-03

**ORDER INSTITUTING**
**PROCEEDINGS PURSUANT TO**
**SECTIONS 6(c) AND 6(d) OF THE**
**COMMODITY EXCHANGE ACT,**
**MAKING FINDINGS AND IMPOSING**
**REMEDIAL SANCTIONS**

**I.**

The Commodity Futures Trading Commission ("Commission") has reason to believe that Dynegy Marketing & Trade ("Dynegy Marketing & Trade") and West Coast Power LLC ("West Coast Power") have violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 9, 13b, 13(a)(2) and 15 (2000). Further, the Commission has reason to believe that Dynegy Marketing & Trade has violated Commission Regulations 1.31, 1.35 and 1.40, 17 C.F.R. §§ 1.31, 1.35 and 1.40 (2002). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Dynegy Marketing & Trade and West Coast Power (collectively, "Respondents") engaged in the violations set forth herein, and to determine whether any order should be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, the Respondents have submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Without admitting or denying the findings of fact herein, the Respondents consent to the entry of this Order in full and final settlement of any alleged violations of the above referenced laws or regulations and acknowledge service of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order"). Respondents consent to the use by the Commission of the findings herein in the proceeding brought by the Commission and in any other proceeding brought by the Commission or to which the Commission is a party.[1]

---

[1] Respondents do not consent to the use of their Offer or the findings in this Order as the sole basis for any other proceeding brought by the Commission, other than a proceeding brought to enforce the terms of this Order. Respondents do not consent to the use of the Offer or the findings in this Order by any other person or entity in this or any other proceeding. The findings made in this Order are not binding on any other person or entity, including, but not limited to, any person or entity named as a defendant or respondent in any other proceeding.

## III.

The Commission finds the following:

## A. SUMMARY

From at least January 2000 through June 2002 (the "Relevant Period"), Respondents reported false natural gas trading information, including price and volume information, to certain reporting firms. Price and volume information is used by the reporting firms in calculating published surveys or indexes ("indexes") of natural gas prices for various hubs throughout the United States. Dynegy Marketing & Trade knowingly submitted the false information to the reporting firms in an attempt to skew those indexes to Dynegy Marketing & Trade's financial benefit. Natural gas futures traders refer to the published indexes for price discovery and for assessing price risks.

In an effort to ensure that its reported information would be used by the reporting firms, Dynegy Marketing & Trade caused Respondent West Coast Power to submit information misrepresenting that West Coast Power was a counterparty to the fictitious trades. In addition, Dynegy Marketing & Trade did not maintain required records concerning the information which it provided to the reporting firms or the true source of the information relayed to those firms as required by Commission Regulations. As a result of their actions, Respondents violated the Act.

Dynegy Marketing & Trade has cooperated in the Commission's investigation of this matter, including, among other things, by conducting an independent internal investigation and by providing the results of that investigation to Commission staff. The Commission has taken that cooperation into consideration in its decision to accept Respondents' Offer.

## B. RESPONDENTS

**Dynegy Marketing & Trade** is a Colorado general partnership, the partners of which are DMT Holdings, L.P. and Dynegy GP Inc. Dynegy Marketing & Trade's headquarters are located at 1000 Louisiana Street, Suite 5800, Houston, Texas 77002. Dynegy Marketing & Trade was one of the largest natural gas marketers in the United States and in 2001, Dynegy Marketing & Trade's natural gas sales averaged 8.2 billion cubic feet (Bcf) per day. Dynegy Marketing & Trade maintained a large natural gas trading operation located on a single floor in its Houston offices that traded natural gas, including futures contracts on the New York Mercantile Exchange ("NYMEX"). Dynegy Marketing & Trade is a non-clearing member of the NYMEX. Dynegy Marketing & Trade has never been registered with the Commission in any capacity.

**West Coast Power LLC**, is a joint venture that was equally owned by an affiliate of Dynegy Marketing & Trade and another energy company. As part of the joint venture, Dynegy Marketing & Trade, among other things, handled all the administrative services and all commodity related concerns. To accomplish these services, Dynegy Marketing & Trade utilized

its own personnel who billed their time to West Coast Power, which itself did not have any employees.

## C. FACTS

### 1.   Gas Market Participants' Use of Information from Reporting Firms

During the Relevant Period, reporting firms compiled and published indexes of natural gas prices for natural gas hubs throughout the United States. The indexes were calculated based upon trading information, including volume and price information, collected by the reporting firms from market participants. Natural gas futures traders refer to the prices published by the reporting firms for price discovery and for assessing price risks. For instance, an increase in prices at a natural gas trading hub signals enhanced demand, and futures traders take account of both price movements and apparent demand when conducting their futures trading.

### 2.   Respondents Report False Market Information

From at least January 2000 through June 2002, Respondents provided false reports to the reporting firms and failed to keep copies of required reports. The false reports included altering price and volume of actual trades and reporting nonexistent trades using the phones, faxes, and the Internet. Respondents continued to provide the false trade data because they believed that it benefited their trading positions or derivatives contracts.

Dynegy Marketing & Trade enlisted West Coast Power to give an appearance of propriety to the false data. During the relevant period for example, as relayed in a Dynegy Marketing & Trade e-mail, a Dynegy Marketing & Trade employee established the following procedure:

> Enron owns the index. Unless we start increasing our volumes we are going to continue to take pain on the cash index. I will get you the contact for [the reporting firm]. I would suggest representing yourself as [W]est [C]oast [LLC] …. We can show offsetting transactions on our activity.

Respondents' dual submission of the false information to the reporting firms was designed to elude detection from the reporting firms by showing trades with an actual counterparty.

## D. LEGAL DISCUSSION

### 1.   By Reporting False Market Information, Respondents Violated Section 9(a)(2) of the Act

Section 9(a)(2) of the Act makes it a violation for any person "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly

3

inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce[.]"[2] *See, e.g., United Egg Producers v. Bauer Int'l Corp.*, 311 F. Supp. 1375, 1383 (S.D.N.Y. 1970) (concluding that false press releases regarding egg importation "tended to affect the price of eggs in interstate commerce"); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1046 (N.D. Ill. 1995) (concluding that false reports can influence prices and constitute part of a manipulation claim).

Respondents violated Section 9(a)(2) of the Act when they knowingly delivered false price and volume information, including fictitious trades, to the reporting firms. As discussed above, price and volume information affect or tend to affect the market price of natural gas, including futures prices as traded on the NYMEX. As such, Respondents violated Section 9(a)(2) of the Act.

### 2. By Attempting to Manipulate Prices, Respondents Violated Sections 6(c), 6(d) and 9(a)(2) of the Act

Sections 6(c) and 6(d) of the Act together authorize the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person ... has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity ... or otherwise is violating or has violated any of the provisions of [the] Act." Section 9(a)(2) provides that it is unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to corner or attempt to corner any such commodity."

The following elements generally are required to show an attempted manipulation: (1) an intent to affect the market price; and (2) some overt act in furtherance of that intent. *See In re Abrams*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,479 at 43,136 (CFTC July 31, 1995). *See also In re Hohenberg Bros. Co.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977). To prove the intent element of manipulation or attempted manipulation, it must be shown that Dynegy Marketing & Trade "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *In re Indiana Farm Bureau Cooperative Association*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,281 (CFTC Dec. 17, 1982). "[I]ntent is the essence of manipulation." *Id.* at 27,282.

Respondents specifically intended to report false or misleading or knowingly inaccurate market information concerning, among other things, trade prices and volumes, to manipulate the

---

[2] Under Section 2(a)(1)(B) of the Act and Section 1.2 of the Commission Regulations, the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust. "[I]t does not matter if the principal participated in or even knew about the agent's acts; he is strictly liable for them." *Stotler and Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988) (citing *Cange v. Stotler*, 826 F. 2d 581, 589 (7th Cir. 1987); *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966-67 (7th Cir. 1986)).

4

price of natural gas in interstate commerce. Respondents' provision of the false reports and their collusion, which was designed to thwart the reporting firms' detection of the false information, constitutes overt acts in furtherance of the attempted manipulation. By so doing, Respondents' conduct constitutes an attempted manipulation under Section 9(a)(2) of the Act, which, if successful, could have affected prices of NYMEX natural gas futures contracts.

### 3. Dynegy Marketing & Trade's Failure to Retain Trading Records Violated Commission Regulations 1.31, 1.35 and 1.40

Dynegy Marketing & Trade, a non-clearing NYMEX member, failed to keep records required of members of a contract market, including records of what Dynegy Marketing & Trade relayed to the reporting firms. Together, Commission Regulations 1.31, 1.35 and 1.40 required Dynegy Marketing & Trade to maintain and to produce upon request to the Commission certain records. Commission Regulations 1.31 and 1.35 required Dynegy Marketing & Trade to maintain and to produce "full, complete, and systematic records, together with all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity futures, commodity options, and cash commodities." In addition, Regulation 1.40 further requires that: "[E]ach member of a contract market shall, upon request, furnish or cause to be furnished to the Commission a true copy of any letter, circular, telegram, or report published or given general circulation by such … member which concerns crop or market information or conditions that affect or tend to affect the price of any commodity, and the true source of or authority for the information contained therein."

By failing to keep the required records, including records of what Dynegy Marketing & Trade relayed to the reporting firms, Dynegy Marketing & Trade violated Commission Regulations 1.31, 1.35 and 1.40. As discussed above, price and volume information affect or tend to affect the market price of natural gas, including futures prices as traded on the NYMEX.

## IV.

### FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Respondents violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, 13(a)(2) and 15 (2000), and that Dynegy Marketing & Trade violated Commission Regulations 1.31, 1.35 and 1.40, 17 C.F.R. §§ 1.31, 1.35 and 1.40 (2002).

## V.

### OFFER OF SETTLEMENT

Respondents have submitted an Offer of Settlement in which, without admitting or denying the allegations or the findings herein, it: acknowledges service of the Order; admits jurisdiction of the Commission with respect to the matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based upon violations or for

enforcement of the Order; waives service and filing of a complaint and notice of hearing, a hearing, all post-hearing procedures, judicial review by any court, any objection to the staff's participation in the Commission's consideration of the Offer, any claim of double jeopardy based on the institution of this proceeding or the entry of any order imposing a civil monetary penalty or other relief, and all claims which it may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (1994) and 28 U.S.C. § 2412 (1996), as amended by Pub. L. No. 104-21, §§ 231-32, 110 Stat. 847, and Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1 *et seq.* (2002), relating to, or arising from, this action; stipulates that the record basis on which this Order is entered consists solely of this Order, including the findings in this Order; and consents to the Commission's issuance of this Order. Pursuant to the Offer of Settlement herein, Dynegy Marketing & Trade and West Coast Power agree to entry of an Order, in which the Commission makes findings, including findings that Dynegy Marketing & Trade and West Coast Power violated Sections 6(c), 6(d), and 9(a)(2) of the Act and that Dynegy Marketing & Trade has violated Commission Regulations 1.31, 1.35 and 1.40 and orders that Respondents cease and desist from violating the provisions of the Act and Commission Regulations they have been found to have violated, and agree to pay a civil monetary penalty of five million dollars ($5,000,000) within five (5) business days of the entry of this Order, and that they comply with their undertakings as set forth in their Offer and this Order.

## VI.

## ORDER

Accordingly, IT IS HEREBY ORDERED THAT:

1. Dynegy Marketing & Trade and West Coast Power shall cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act and Dynegy Marketing & Trade shall cease and desist from violating Commission Regulations 1.31, 1.35 and 1.40;

2. Respondents, jointly and severally, shall pay a civil monetary penalty in the amount of five million dollars ($5,000,000) within 5 (five) business days of the date of the entry of this Order, and make such payment by electronic funds transfer to the account of the Commission at the United States Treasury or by certified check or bank cashier's check made payable to the Commodity Futures Trading Commission and addressed to Dennese Posey, or her successor, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581, under cover of a letter that identifies the Respondents and the name and docket number of this proceeding. Copies of the cover letter and the form of payment shall be simultaneously transmitted to Gregory G. Mocek, Director, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581, and to Stephen J. Obie, Regional Counsel, Division of Enforcement, Commodity Futures Trading Commission, 140 Broadway, New York, New York 10005. If payment is not made in accordance with the requirements of this paragraph, the Order shall be vacated and the proceedings reinstated;

3. Respondents shall comply with the following undertakings:

A.    COOPERATION WITH THE COMMISSION

Respondents shall continue to cooperate fully and expeditiously with the Commission, and its staff, including the Division of Enforcement, in this proceeding and any investigation, civil litigation, or administrative matter related to the subject matter of this proceeding.    Respondents agree that this undertaking includes the Respondents in this proceeding and any subsidiaries or affiliates within their control.  As part of such cooperation, Respondents agree to comply fully, promptly, and truthfully to any inquiries or requests for information including but not limited to (1) requests for authentication of documents; (2) requests for any documents within Respondents' possession, custody, or control, including inspection and copying of documents; (3) requests for agents and employees of Respondents to testify completely and truthfully to the Division; (4) requests to produce any current (as of the time of the request) officer, director, or employee of Respondents, regardless of the employee's location, for interviews, depositions, or testimony, and to provide testimony or assistance at any trial related to the subject matter of this proceeding; and (5) requests for assistance in locating and contacting any prior (as of the time of the request) officer, director, or employee of Respondents.  Respondents also agree that they will not undertake any act which would limit their ability to fully cooperate with the Commission.  Respondents designate Kenneth M. Rosenzweig, Esq., of the Mayer Brown Rowe & Maw law firm to receive all requests for information pursuant to this undertaking.  Should Respondents seek to change the designated person to receive such requests, notice shall be given to the Division of such intention 14 days before it occurs.  Any person designated to receive such request shall be located in the United States.

B.    PUBLIC STATEMENTS

By neither admitting nor denying the findings of fact, Respondents agree that neither they nor any of Respondents' agents or employees under their authority and control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in the Order or creating, or tending to create, the impression that the Order is without factual or legal basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations; or (ii) right to take factual or legal positions in other proceedings to which the Commission is not a party.  Respondents will undertake all steps necessary to assure that all of their agents, and employees under their authority and control understand and comply with this agreement.

By the Commission.

Jean A Webb

Jean A. Webb
Secretary of the Commission

Dated:   December 18, 2002